**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MALCOLM COLEMAN | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  22-864 |
| | : | |
| SEAN GALLAGHER | : | |

## <u>MEMORANDUM</u>

MURPHY, J.                                                                 August 9, 2023

### I.   <u>Introduction</u>

We are at the summary judgment stage in this excessive force case.  The question is whether Norristown Police Officer Sean Gallagher used objectively reasonable force when he struck Malcolm Coleman — an individual wanted for attempted murder — three times in the head.  Officer Gallagher delivered the blows at the tail end of a lengthy episode where Mr. Coleman ran, struggled, and fought to avoid arrest.

At this stage, we must view the facts in the light most favorable to Mr. Coleman.  The video recordings tell much of the story.  But they leave a fair question as to whether Mr. Coleman had stopped resisting arrest shortly before Officer Gallagher hit him — a significant factor in determining whether the three punches were an objectively reasonable amount of force.  On that basis, and over a qualified immunity defense, we will send Mr. Coleman's constitutional and state law claims to a jury.

### II.   <u>Facts</u>[1]

On November 6, 2020, an anonymous person called a Montgomery County 911 operator

---

[1] The factual background comes from (1) the statements of fact that Mr. Coleman admitted in his opposition to Officer Gallagher's summary judgment motion, and (2) counterstatements of material fact submitted by Mr. Coleman as the non-moving party.

regarding Mr. Coleman.[2]  The caller requested anonymity[3] and said the police wanted Mr. Coleman for attempted murder.[4]

The caller described Mr. Coleman's physical features — "a black male, 6'5" tall, thin build, wearing a gray or black sweat suit."[5]  The caller knew the car Mr. Coleman was driving.[6]  He said Mr. Coleman was dangerous, on the run,[7] and headed towards Mr. Coleman's mother's house.[8]  And the caller said that Mr. Coleman tried killing him.[9]

The Norristown Police responded.  Both parties state that the police's body camera footage of the following events "should control [our] view of the incident irrespective of any argument made by either party."[10]  We recount the relevant footage here — all of which occurred within about a three-minute span.

---

[2] *See* DI 10 ¶ 7; *id.* Ex. D4.

[3] *Id.* ¶ 10.

[4] *Id.* ¶ 7; *see also id.* ¶ 9 (referencing warrant for arrest regarding a May 27, 2020 shooting); *id.* Ex. D5.

[5] *Id.* ¶ 7; *see id.* Ex. D4.

[6] *See id.* ¶ 7; *id.* Ex. D4.

[7] *Id.* ¶ 10.

[8] *Id.* ¶ 7.

[9] *See id.* Ex. D5 at 2 ("Most importantly, the dispatcher relayed that the caller advised, that COLEMAN tried to kill the caller."); *id.* Ex. D5 at 1 ("The caller is scarred [sic] of COLEMAN).

[10] *Id.* ¶ 12; DI 12 ¶ 12 (both citing *Scott v. Harris*, 550 U.S. 772, 380 (2007)).  The parties also submitted cell phone video camera footage, which we consider as well.  Our characterization of the video footage tracks Mr. Coleman's, but we must not adopt any characterization blatantly contradicted by the video.

Norristown Police Officer Sean Gallagher arrived first at Franklin Street in Norristown.[11] He initially tried to "stall" so his fellow officers could help him arrest Mr. Coleman.[12]  Once other officers arrived, Officer Gallagher approached Mr. Coleman on the sidewalk, grabbed Mr. Coleman's right arm, and told him he was under arrest.[13]

Mr. Coleman broke his right arm free from Officer Gallagher and tried to start running away from him towards the street.[14]  Officer Gallagher drew his taser and shot Mr. Coleman.[15] The taser hit Mr. Coleman in the back.[16]  Mr. Coleman fell to the ground against a car on the opposite side of Franklin Street.[17]  Officer Gallagher followed Mr. Coleman to the ground.[18] Crouched down, Officer Gallagher struck Mr. Coleman with his taser when he tried standing back up.[19]

Two other officers assisted Officer Gallagher in trying to restrain Mr. Coleman.[20]  One of

---

[11] *See* DI 10 ¶ 11; *id.* ¶ 2; *see also id.* Ex. D9a at 21:11:22.

[12] *Id.* ¶ 11.

[13] *Id.*; *see id.* Ex. D9a at 21:11:23.

[14] *Id.* Ex. D9a at 21:11:23; *id.* Ex. D9b at 21:11:23-24.

[15] *Id.* Ex. D9b at 21:11:25-27.  The parties dispute whether, at the time Mr. Coleman broke free of Officer Gallagher, he reached for his waistband.

[16] *Id.* at 21:11:28.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 21:11:29.  The parties dispute whether Mr. Coleman said, "I'm not going back to jail," around the time Officer Gallagher struck him with his taser in hand.

[20] *Id.* at 21:11:30-35.

the officers — standing next to the crouching Officer Gallagher — held a gun to Mr. Coleman.[21] The other grabbed Mr. Coleman's right arm to stop him from moving.[22]  Mr. Coleman was instructed to "stay down" on the ground.[23]

The three engaged officers, Officer Gallagher included, tried subduing Mr. Coleman.[24] Mr. Coleman attempted to free himself from the grasp of the two officers that held his arms.[25] At the same time, Mr. Coleman yelled to the officers, "what the f—ck is going on?"[26]  A fourth officer held a barking police dog on a leash and stood close by to the three officers wrestling with Mr. Coleman.[27]  At one point, an officer told Mr. Coleman to "not move or you're going to get bit."[28]

Then, the three officers physically engaged with Mr. Coleman pinned him against a nearby parked vehicle.[29]  Two of the three officers held his arms, and the third — Officer Gallagher — shifted towards Mr. Coleman's middle back, while gripping the back of his shirt

---

[21] *See id.* Ex. D9a at 21:11:28.

[22] *Id.* at 21:11:31.

[23] *See id.* at 21:11:28.

[24] *See id.* Ex. D9b at 21:11:38.

[25] *See id.* Ex. D9a at 21:11:33-40; *id.* Ex. D9b at 21:11:38.

[26] *See id.* Ex. D9a at 21:11:39.

[27] *See id.* at 21:11:38.

[28] *See id.* at 21:11:52-53.

[29] *See id.* at 21:11:43.

collar.[30]

A fifth officer stood a few feet from the three officers grappling with Mr. Coleman.[31] Facing the left side of Mr. Coleman's front body, the fifth officer deployed his taser on him.[32] Immediately after, Mr. Coleman leaned his head backwards and hunched forward in a motion appearing to be exhalation, which Mr. Coleman asserts is demonstrative of the physical effect of the taser shot.[33] Just a few seconds later, Officer Gallagher punched Mr. Coleman three times in the head.[34]

The two officers standing behind Mr. Coleman placed him in handcuffs around the same time Officer Gallagher punched Mr. Coleman.[35] With the three officers working to put Mr. Coleman in handcuffs, Officer Gallagher controlled Mr. Coleman's right leg and took him to the ground.[36] One of the officers explained to Mr. Coleman that there was a warrant out for his

---

[30] *See id.* Ex. D9b at 21:11:48.

[31] *Id.* Ex. D9b at 21:11:49; *see id.* Ex. D9f at 21:11:51.

[32] *Id.* ¶ 11; *see id.* Ex. D9c at 21:11:52; *id.* Ex. D8 at 3.  The parties dispute whether the officer's deployment of the second taser had any effect on Mr. Coleman.

[33] *Id.* Ex. D9f at 21:11:50-52.  Exactly what was happening at this moment from Mr. Coleman's and the officers' perspectives is not entirely clear from the video and ultimately will be for the jury to decide.

[34] *Id.* ¶ 4; *see id.* Ex. D9f at 21:11:53-55.

[35] *See id.* Ex. D9b at 21:12:00-08.  The parties dispute whether Mr. Coleman was handcuffed at the time.  *Compare* DI 10 ¶ 11 ("Only [after Officer Gallagher punched Mr. Coleman] were other [o]fficers able to handcuff Plaintiff."), *with* DI 12 at 6-7 ("Three officers have immobilized his arms and are applying handcuffs when the force is employed.  Coleman is pushed up against a car by four officers, has not [sic] egress, and is prevented from long range flight . . . .").

[36] *See* DI 10 Ex. D9c at 21:12:18-22.

arrest.[37]  The officers jointly lifted Mr. Coleman off the ground and placed him in the back of a police vehicle.[38]

Less than an hour after the initial 911 call, Mr. Coleman was in custody.[39]  Mr. Coleman eventually pled guilty in state court to resisting arrest.[40]  He currently resides in SCI-Phoenix.[41]

## III.    <u>Officer Gallagher's Motion for Summary Judgment</u>

About a year and a half after the incident, Mr. Coleman sued Officer Gallagher.  *See generally* DI 1.  He alleged that Officer Gallagher violated his Fourth Amendment rights by using excessive force against him.  He claimed that "no justification existed for" punching him three times in the face because he "was already in custody and restrained by handcuffs."  *Id.* ¶ 17.  Mr. Coleman also sued Officer Gallagher for assault and battery under Pennsylvania state law.  *See id.* ¶¶ 18-24.

Now, Officer Gallagher moves for summary judgment.  *See generally* DI 10.  First, Officer Gallagher argues that "no reasonable jury could determine that the punches" he threw "constitute unreasonable force under the Fourth Amendment."  *Id.* at 10-11.  Second, Officer Gallagher maintains his use of force is justified under Pennsylvania law.  *Id.* at 11-12.  Third, Officer Gallagher argues that qualified immunity shields him from liability for Mr. Coleman's

---

[37] *See id.* Ex. D9a at 21:13:08-15.

[38] *See id.* Ex.D9c at 21:13:40-50.

[39] *Id.* ¶ 8.

[40] *Id.* ¶ 5; *see id.* Ex. D2.

[41] *Id.* ¶ 1.

Fourth Amendment claim.  *See id.* at 12-15.  He submits that no clearly established law existed at the time that prohibited him from helping effectuate the arrest by punching Mr. Coleman.  *Id.* at 15.

Mr. Coleman responds that a reasonable jury could find that the police officers could have subdued him "without the sucker-punches."  DI 12 at 7.[42]  He contests Officer Gallagher's characterizations of the video footage, arguing that a "[r]easonable fact finder could conclude that [his] wrists are behind his back and either handcuffed on or on the process of cuffing" when Officer Gallagher hits him.  *Id.* at 6.  He also argues that his state law claims should proceed to trial for the same reasons.  *See id.* at 7-8.  With respect to qualified immunity, Mr. Coleman relies on the court's opinion in *Buber v. Township of Old Bridge*, which he argues held "that a reasonable officer would have known that punching a man in handcuffs would have been excessive under the circumstances of the case."  *Id.* at 8 (citing 2007 WL 4557658 (D.N.J. Dec. 21, 2007)).

We have jurisdiction over Mr. Coleman's constitutional and state law claims.  *See* 28 U.S.C. §§ 1331, 1367(a).  The motion is ripe for disposition.  For the reasons set forth below, we deny Officer Gallagher's motion for summary judgment.

## IV.   <u>Standard of Review</u>

The Federal Rules of Civil Procedure require a party seeking summary judgment to "show[] that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SodexoMAGIC, LLC v. Drexel*

---

[42] Citations to DI 12 use the pagination of the CM/ECF docketing system.

*Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) ("[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit.").  And a "genuine dispute" over a material fact means "a reasonable jury could return a verdict for" the party *not* moving for summary judgment.  *Anderson*, 477 U.S. at 248.

When deciding whether a genuine dispute over a material fact exists, we must view "the evidence in the light most favorable to the nonmovant."  *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *see Young v. Martin*, 801 F.3d 172, 174 n.2 (3d Cir. 2015).  We must not "weigh the evidence and assess its veracity."  *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021).

Here, police body camera footage presents an "added wrinkle" to our view of the evidence.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  "[W]here there is reliable video depicting the events in question, courts must not adopt a version of the facts that is '*blatantly contradicted*' by the video footage."  *Jacobs v. Cumberland County*, 8 F.4th 187, 192 (3d Cir. 2021) (emphasis added) (quoting *Scott*, 550 U.S. at 380).

## V.   <u>Analysis</u>

### A.   **A jury may find that a reasonable officer on the scene would consider the force used — Officer Gallagher's three punches — as objectively unreasonable.**

"[A] plaintiff must show that a seizure occurred and that [the seizure] was unreasonable under the circumstances" to state a Fourth Amendment excessive-force claim.  *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011).[43]  The Supreme Court has said "[i]f there is no

---

[43] The parties do not appear to dispute that a seizure occurred here, which is essential for a Fourth Amendment excessive-force claim.  *See Perez v. Borough of Johnsonburg*, __ F.4th __, 2023 WL 4673746, at *3 (3d Cir. July 21, 2023) ("A seizure occurs when an officer, 'by means

excessive force claim under *Graham*, there is no excessive force claim at all." *County of Los Angeles v. Mendez*, 581 U.S. 420, 429 (2017).  So, *Graham v. Connor* is our guide.  490 U.S. 386 (1989).

In *Graham*, the Supreme Court ruled that "an excessive force claim" is "properly characterized as one invoking the protections of the Fourth Amendment" when it "arises in the context of an arrest or investigatory stop of a free citizen." *Id.* at 394.  Deciding whether force is excessive requires balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  "Balancing" involves surveying "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

*Graham*'s list of facts and circumstances has grown.  *See Dean v. Borough of Glassboro*, 2023 WL 2597586, at *2 n.2 (3d Cir. Mar. 22, 2023).  The Supreme Court has said that, to decide whether force is excessive, we also may examine

- the relationship between the need for the use of force and the amount of force used;
- the extent of the plaintiff's injury;
- any effort made by the officer to temper or to limit the amount of force;
- the severity of the security problem at issue;
- the threat reasonably perceived by the officer; and
- whether the plaintiff was actively resisting.

---

of physical force or show of authority,' restrains the citizen's liberty." (quoting *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014))).  Therefore, our analysis focuses on only prong two: the reasonableness of the force used.

9

*Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *see also Jacobs*, 8 F.4th at 194-95.

Crucially, we must assess the reasonableness of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We must not "'freeze the time frame' and consider only the facts and circumstances at the precise moment that excessive force is applied." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). And we are cognizant that "[t]he reasonableness of the use of force is normally an issue for the jury." *Id.*

Referencing *Graham*, the Third Circuit has held a district court did not err in concluding "that beating a suspect on the face and head, who is lying down and not resisting arrest, would constitute excessive force." *Gulley v. Elizabeth City Police Dep't*, 340 F. App'x 108, 110 (3d Cir. 2009) (reviewing, under the collateral order doctrine, a set of facts identified by the district court during summary judgment). In *Gulley*, the perpetrator of a "vehicular chase" crashed his car and led police officers on a foot chase. *Id.* at 109. The officers were responding to reports of "armed carjacking and the kidnapping of one of the vehicle's passengers." *Id.* The perpetrator "attempted to hide" from the police "by lying down" during the chase, but once spotted, the officers began beating him in the head and face. *Id.* When the perpetrator "gave [his] right hand" to an officer so he could be handcuffed, he "started getting hit upside the head some more." *Id.* The Third Circuit affirmed that the district court did not err by holding the force used by the officers may be excessive. *Id.* at 110; *cf. Gunter v. Township of Lumberton*, 535 F. App'x 144, 148 n.4 (3d Cir. 2013) (concluding use of pepper spray did not constitute excessive force because "[t]he record indicate[d] that [plaintiff's] resistance 'escalate[d]' after the pepper spray was administered" three times (fourth alteration in original)).

Similarly, in *Sarrano v. City of Scranton*, the court held that "the evidence [was] disputed as to whether the actions of [a police officer] in punching plaintiff in the face twice to subdue him while he was laying in bed with one of his hands cuffed were objectively unreasonable." 2019 WL 450573, at *6 (M.D. Pa. Feb. 5, 2019).  The plaintiff, who was being arrested for assaulting his partner, testified "that he was not a threat to either [o]fficer" when they arrived at his home, nor was he "armed with any weapons."  *Id.* at *3.  When the officers reached to grab the plaintiff's hands to arrest him, he "pulled his hand away."  *Id.*  To force the "plaintiff to comply with the order," one officer "punched plaintiff twice in the face with a closed fist."  *Id.*

The *Sarrano* court stated that "a jury must resolve the question of whether [the] conduct was objectively reasonable under the circumstances."  *Id.* at *6.  The court carefully balanced the fact that the police were arresting the plaintiff "for a violent crime," with the fact that "plaintiff had gone to bed . . . stated that he was asleep . . . posed no threat to the officers . . . had no weapon at the time . . . was already cuffed and two [o]fficers were present."  *Id.*; *see also Wnek v. City of Philadelphia*, 2007 WL 1410361, at *4 (E.D. Pa. May 10, 2007) (denying summary judgment where "undisputed fact" showed "[p]laintiff was already handcuffed at the time" a police officer assaulted him).

Here, when viewing the facts in the light most favorable to Mr. Coleman, there are genuine disputes of material fact that a jury must resolve as to whether the punches thrown were an objectively reasonable amount of force.  We have no shortage of facts to weigh, but we "cannot apply this standard mechanically."  *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (quoting *Kingsley*, 576 U.S. at 397).  And we will not "freeze" the facts as they existed at the time Officer Gallagher punched Mr. Coleman.

11

Mr. Coleman does not dispute that the events in question arise from the warrant for his arrest for attempted murder. *See Kingsley*, 576 U.S. at 397 ("the threat reasonably perceived by the officer"); DI 12 ¶ 9. He does not dispute that he (1) resisted arrest by trying to break free from other responding officers, as shown by the body camera footage, and (2) later pled guilty to resisting arrest. *But see Gulley*, 340 F. App'x at 109 (perpetrator "'just laid' in the ditch" and did not resist arrest). These undisputed facts weigh in favor of considering the force used as objectively reasonable.

But whether Mr. Coleman stopped resisting the arresting officers before being punched is a disputed and highly material fact. And a reasonable trier of fact may find that Mr. Coleman had stopped resisting, and that the force used after that was disproportionate to "the need for the use of force." *Kingsley*, 576 U.S. at 397. Mr. Coleman contends he "was relenting in the struggle at the time he was punitively struck" by Officer Gallagher. DI 12 ¶ 12. The body camera footage does not "blatantly contradict" this characterization of the facts. *See Scott*, 550 U.S. at 380. Nor does the footage blatantly contradict Mr. Coleman's counterstatement of fact that the second taser shot had *some* effect on him. *See* DI 12 ¶ 11. *But see* DI 10 ¶ 11 (stating taser had "no effect due to the type of clothing" Mr. Coleman wore). Mr. Coleman appears to lean back and exhale right after the officer shot his taser. DI 12 at 6-7; *see* DI 10 Ex. D9f at 21:11:50-52.[44] A reasonable jury may find that Mr. Coleman's "relenting" is like the perpetrator in *Gulley* — who gave up his hand to police officers prior to being excessively struck in the

---

[44] If anything, a jury may find that Officer Gallagher's statement of fact — that "the type of clothing worn by" Mr. Coleman stopped the taser from affecting him — contradicts the video footage of the first taser deployment, which hit Mr. Coleman in the back and caused him to fall to the ground. Again, another finding of fact best left for the jury.

head — and unlike the plaintiff in *Gunter* — who increased the amount of resistance against the police after being pepper sprayed.[45]   Further, a reasonable jury may find that deploying the second taser inhibited Mr. Coleman's movement, forced him to relent, and would have caused a reasonable officer on the scene to "limit the amount of force" used directly afterwards.  *Kingsley*, 576 U.S. at 397.

Additionally, the footage does not blatantly contradict Mr. Coleman's contention that, at the time of the punches, his "wrists are behind his back and either handcuffed on or [in] the process of cuffing."  DI 12 at 6.  Whether the arresting officers had Mr. Coleman secured in handcuffs at the time of the punches is a disputed, material fact.  Like the plaintiffs in *Gulley* and *Sarrano*, the video shows that two officers held Mr. Coleman's arms seconds before Officer Gallagher punched him, and at the time of the punches, at least one of his wrists was held behind his back.  DI 10 Ex. D9b at 21:11:53.  A reasonable officer on the scene may conclude that the punches were excessive — with Mr. Coleman in position to be put in handcuffs or already in handcuffs.

Our analysis above highlights the moments right around Officer Gallagher's punches because those moments involve key disputes.  But we view those moments not in isolation, but

---

[45] And as Mr. Coleman points out, accepting his version of the facts does not undermine his guilty plea for resisting arrest.  *See* DI 12 ¶ 5; *see also* DI 10 Ex. D2 (showing Mr. Coleman's guilty plea for violating 18 Pa. Cons. Stat. § 5104).  "[T]here undoubtedly could be 'substantial force' which is objectively reasonable and 'substantial force' which is excessive and unreasonable."  *Nelson v. Jashurek*, 109 F.3d 142, 145 (3d Cir. 1997); *see also Jefferson v. Lias*, 21 F.4th 74, 86-87 (3d Cir. 2021) (similar); *Garey v. Borough of Quakertown*, 2013 WL 3305222, at *7 (E.D. Pa. July 13, 2013) ("In particular, when a plaintiff's Section 1983 claim is premised on force used against him *after* he had been subdued and placed under arrest, the fact of his conviction for resisting arrest should have no collateral estoppel effect.").

Nor does Officer Gallagher address *Heck v. Humphrey*, 512 U.S. 477 (1994), in his motion or in a reply.

rather in the context of the surrounding events, as we must.  To be sure, that context weighs against Mr. Coleman's contentions.  But not enough to warrant summary judgment.

Further, a reasonable jury may also find that "the number of persons with whom the police officers must contend at one time" made the force used objectively unreasonable.  *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (noting "the number of persons with whom the police officers must contend at one time" as a relevant factor in excessive force analyses); *see Kingsley*, 576 U.S. at 397 ("the severity of the security problem at issue").  Right after Officer Gallagher shot Mr. Coleman with his taser and struck him on the ground, at least two more officers joined in the struggle — one pointing a gun at Mr. Coleman.  A fourth officer stood by with a police dog and watched the officers grapple with Mr. Coleman.  The officers warned Mr. Coleman that the dog would bite him if he continued resisting arrest.  And a fifth officer deployed a second taser on Mr. Coleman merely seconds before Officer Gallagher punched him in the head.  A reasonable officer on the scene may conclude it was unnecessary for Officer Gallagher to punch Mr. Coleman given that the police outnumbered him five to one.

Finally, there is a genuine dispute of material fact as to whether there was a "possibility that [Mr. Coleman] may be armed."  *Sharrar*, 128 F.3d at 822.  Viewing the facts in the light most favorable to Mr. Coleman, the video does not blatantly contradict his assertion that he did *not* reach for his waistband before Officer Gallagher deployed the first taser on him.  *See* DI 12 ¶ 11.  This would suggest that he did not have a firearm on him, despite Officer Gallagher's contrary belief.  *See* DI 10 ¶ 11.

In sum, these genuine disputes of material fact exist and preclude Officer Gallagher from

summary judgment.  A jury will decide.[46]

### B. Qualified immunity does not protect Officer Gallagher because Mr. Coleman's right to be free from the excessive force used was clearly established at the time.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To determine whether qualified immunity applies, courts "engage in a two-part analysis: (1) whether the plaintiff sufficiently alleged a right had been violated, and (2) whether that right was clearly established when it was allegedly violated to the extent 'that it would have been clear to a reasonable person that his conduct was unlawful.'"  *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Williams v. Sec'y Pa. Dep't of Corrs.*, 848 F.3d 549, 557 (3d Cir. 2017)).

We already explained that a genuine dispute of material fact exists as to whether Officer Gallagher violated Mr. Coleman's Fourth Amendment rights.  *See supra* Section V.A.  We now answer whether Officer Gallagher violated a "clearly established" right.

The Third Circuit has utilized another "two-part inquiry" to determine if a right was clearly established.  *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).  First, the Third

---

[46] We also deny summary judgment on Mr. Coleman's assault and battery claims. Officer Gallagher's main contention is that his "action in punching [Mr. Coleman] on the side due to his continued violent resistance was reasonable under the circumstances."  DI 10 at 11. Because a reasonable jury may find the force used objectively unreasonable, Officer Gallagher's argument fails.  *See Bellmon v. City of Philadelphia*, 895 F. Supp. 2d 659, 668 (E.D. Pa. 2012) ("Given these factual disputes about the intent and reasonableness of [defendant's] actions, summary judgment is also inappropriate on the [p]laintiff's assault and battery claim . . . ."); *cf. Moore v. Vangelo*, 222 F. App'x 167, 172 (3d Cir. 2007) (citing *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)) (granting summary judgment where court previously held plaintiff's Fourth Amendment rights were not violated).

Circuit "define[s] the right allegedly violated at the appropriate level of specificity." *Id.* (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)). "Defining the contours of the right is critical to determining whether it was clearly established." *Clark*, 55 F.4th at 181.

Second, the Third Circuit asks "whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Peroza-Benitez*, 994 F.3d at 165 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Said differently, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Reichle v. Howards*, 556 U.S. 658, 664 (2012)). The existing precedent need not be "Supreme Court precedent or binding Third Circuit precedent"; "[d]istrict court decisions, though not binding, also play a role in the qualified immunity analysis." *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017) (quoting *Doe v. Delie*, 257 F. 3d 309, 321 n.10 (3d Cir. 2001)); *see also El v. City of Pittsburgh*, 975 F.3d 327, 340-41 (3d Cir. 2020) ("[U]npublished cases, which are not binding, cannot establish a right."). And the existing precedent need not have "precise factual correspondence" with the facts at hand. *Peroza-Benitez*, 994 F.3d at 166 (quoting *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)); *see also Duvall v. Hustler*, 447 F. Supp. 3d 311, 332 (E.D. Pa. 2020) ("Of course, a case *exactly* on point is rare . . . .").

First, we define the right with appropriate specificity. Officer Gallagher appears to frame the right at issue as the right for Mr. Coleman — "a violent resistor" — to be free from "two strikes [to the head] or even three . . . where no significant harm is caused and which allows officers to get [him] into custody." DI 10 at 15. On the other hand, Mr. Coleman defines the right at issue as his right to be free from punches while "in handcuffs" and "just as he was

[being] subdued and in the process of relenting."  DI 12 at 8-9.

Officer Gallagher's definition puts the rabbit in the hat.  When "adopting [Mr. Coleman's] version of the facts," his "definition of the constitutional right is better tailored to the context and facts in this case."  *Round v. City of Philadelphia*, 2022 WL 2916681, at *20 (E.D. Pa. July 22, 2022).  An integral part of our analysis is recognizing that, taking Mr. Coleman's version of the facts as true, he relented or was in the process of stopping his resistance before Officer Gallagher punched him.  The video footage does not blatantly contradict this fact.  Therefore, the right at issue is Mr. Coleman's right to be free from being struck three times in the head as he stopped resisting officers' efforts to arrest and subdue him by restraining his arms, placing him or attempting to place him in handcuffs, and tasing him.

Next, we use existing precedent to decide whether a reasonable officer would contemporaneously understand that punching Mr. Coleman as Officer Gallagher did would violate his Fourth Amendment rights.  The parties have not given us much to work with.  Mr. Coleman cites to only two cases to argue that Officer Gallagher violated a clearly established right,[47] but both are out of district and unpublished.  *See El*, 975 F.3d at 340-41.  And Officer Gallagher directs us to only one Third Circuit case[48] discussing qualified immunity within the context of a car chase with the police.

Nevertheless, sufficiently analogous, published cases show that the constitutional right was clearly established at the time.  *See Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009)

---

[47] *See* DI 12 at 8-9 (first citing *Buber*, 2007 WL 4557658 (D.N.J. Dec. 21, 2007); then citing *Doss v. Osty*, 2011 WL 2559558 (D.N.J. June 27, 2011)).

[48] *See* DI 10 at 14 (citing *Sauers v. Borough of Nesquehoning*, 905 F.3d 711 (3d Cir. 2018)).

(explaining in the Eighth Amendment context that "at the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) ("[T]he right of an arrestee to be free from the use of excessive force *in the course of his handcuffing* clearly was established" where plaintiff suffered injury from overly-tight handcuffs. (emphasis added)); *see also Jackson v. City of Pittsburgh*, 688 F. Supp. 2d 379, 385 (W.D. Pa. 2010) (concluding constitutional right was clearly established where "[p]laintiff was unarmed and not exerting any threats towards the officers" and an officer "punched him in the throat, face, and eyes numerous times in the process of arresting him and while he laid still on the ground"); *Noble v. City of Camden*, 112 F. Supp. 3d 208, 228 (D.N.J. 2015) (denying qualified immunity where jury could find "[p]laintiff was not resisting arrest during any part of the encounter; police officers punched and kicked him while his arms were restrained; and that, after taking [p]laintiff to the ground and placing handcuffs on him, officers continued to beat and kick [p]laintiff"); *cf. Luchtel v. Hagemann*, 623 F.3d 975, 983 n.3 (9th Cir. 2010) (holding clearly established right did not exist where plaintiff and other witnesses "agreed that she resisted the officers' attempts to restrain her; there were differences only as to how vigorously she resisted and as to how much of a problem she posed to the officers").

       As stated, a crucial part of our analysis is that Mr. Coleman's counterfactual — i.e., "he was subdued and in the process of relenting" to the officers — is not blatantly contradicted by the body camera footage.  DI 12 at 9; *see id.* ¶ 12 ("[T]he video demonstrates that [p]laintiff was relenting in the struggle at the time he was punitively struck . . . .").  Accepting that fact as true makes it especially evident that the constitutional right in question was clearly established.

Therefore, Officer Gallagher is not entitled to qualified immunity.

**VI.**   **<u>Conclusion</u>**

We conclude the following:

- A genuine dispute of material fact exists as to whether a reasonable officer on the scene would consider Officer Gallagher's as excessive force.  We **DENY** Officer Gallagher's summary judgment motion with respect to this claim.

- We **DENY** his motion with respect to Mr. Coleman's state law assault and battery claims.

- Qualified immunity does not shield Officer Gallagher from liability.

This case will proceed to trial.